FIRST NAT. GOLD MINING CO. OF NEW YORK & COLORADO v. ALTVATER et al.

(Circuit Court of Appeals, Eighth Circuit.   December 5, 1906.)

No. 2,342.

1. TRIAL—DIRECTION OF VERDICT.

A question of law arises at the close of the evidence whether there is any substantial evidence on which a verdict can be sustained in favor of the party producing the evidence, and, if there is no such evidence, it is the duty of the court to direct the jury to return a verdict against them.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 339, 376–380.]

2. MINES AND MINERALS—LOCATIONS—ASSESSMENT WORK—PERFORMANCE—EVIDENCE.

In a suit to quiet title to a mining claim, evidence *held* insufficient to establish that the persons under whom defendants claimed title to the ground under a prior location had performed the assessment work required by Rev. St. 1878, § 2324 [U. S. Comp. St. 1901, p. 1426], so as to hold the ground against plaintiff's subsequent location.

In Error to the Circuit Court of the United States for the District of Colorado.

H. Riddell and E. W. Hurlbut, for plaintiff in error.

William H. Bryant (Charles S. Thomas and William P. Malburn, on the brief), for defendants in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge.   The plaintiff in error, the First National Gold Mining Company of New York and Colorado, in 1901 made application to the General Land Office of the United States for a patent on what is known as the "Burroughs Lode," embracing a number of alleged contiguous mines hitherto known as the "Garrison," the "Vanderen," the "Beverly," the "Ford," the "Farmer," and on the west of said group the "Garrison," the latter embracing 233⅔ feet in length and 50 feet in width.   The said mines had been located, perhaps, as early as 1859.   The First National Gold Mining Company claims to have acquired said mining claims prior to 1889.   There was no record evidence of the title to the said Vanderen, Beverly, Ford, and Farmer claims beyond a prior occupancy by the plaintiff in error and its predecessors.   Said application for a patent was adversed by John Clear, Joseph Updegraff, and Martin Lawler, who are represented in this litigation by their respective administrator and administratrix. The said John Clear in his lifetime became the assignee of the prop-

erty in controversy under a location made thereon August 20, 1891, known as the "John Clear" location, August 20, 1891. Conformably to the provisions of section 2326, Rev. St. [U. S. Comp. St. 1901, p. 1430], the adversing claimants instituted this action to determine the rights of the respective claimants to the premises.

The statute applicable to the situation (section 2324, Rev. St. U. S. 1878 [U. S. Comp. St. 1901, p. 1426]) declares that:

"On all claims located prior to the tenth day of May, 1872, ten dollars' worth of labor. shall be performed or improvements made by the tenth day of June, 1874, and each year thereafter, for each one hundred feet in length along the vein until a patent has been issued therefor; but where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to re-location in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location."

The contentions made in the pleadings on behalf of the plaintiffs below are (1) that when said Clear made his discovery location and sunk his shaft in August, 1891, the premises were public domain, subject to entry, because the defendant below had not done the required amount of assessment work thereon for the years 1890 and 1891; and (2) that even if the defendant below did any such work, it was at the easterly end of the entire strip of ground, and as it had not shown any title to the 200 feet embracing the said Vanderen, Beverly, Ford, and Farmer claims, of 200 feet in length, the assessment work done on the strip east thereof could not be regarded as sufficient to preserve the other claims. At the conclusion of the evidence the court directed a verdict for the plaintiffs below.

As the ground in controversy, where Clear and others made their alleged discovery shaft in August, 1891, had never been patented, it was subject to location if there had not been done the required amount of work thereon for the year 1890 by the applicant for the patent. Lawler and Updegraff having died before the hearing, their testimony is absent. There is no claim made that the defendant below did any assessment work in 1891 before the location of the Clear lode, but it is claimed that the required assessment work was done in 1890 on the 183-foot strip in the shafts and drifts thereon, known as the Gould Shaft. The substance of the testimony on behalf of the plaintiffs below was as follows: Said Clear testified that he had lived for many years in the immediate vicinity of the Burroughs lode, and had known it for many years; it was about 400 feet from where he lived. He saw no work done thereon in 1890, although he worked on the Camp Grove mine, 300 or 400 feet away, for three months in 1890; that in passing from the Camp Grove to his home he went within about 300 feet of the Burroughs mine; that he worked on the Kansas lode about 150 feet therefrom; that nobody did any work on the Burroughs lode to his knowledge; that he saw the Gould shaft on that part of the Burroughs lode every day in the week from his boarding house, and did not see anybody about the Gould shaft in 1890, and that he did not believe that any one could have been working there without his seeing them.

Harvey Henry, who had lived near this place since 1865, who was an engineer and miner, testified that he knew the premises ever since he went there, and that he worked on the Camp Grove in 1890; that to the best of his knowledge no work was done on the Burroughs in that year; that he would have seen the work had it been done because he was working right there close to it always. The Camp Grove claim was 450 or 500 feet away; that he worked as an engineer on that claim, which kept him on the surface and in plain view of the Burroughs; that he worked on the Camp Grove claim during the last eight months of the year, but lived in Nevadaville, close by, right along. He was satisfied that no work was done on the Burroughs for the year 1890, because he was passing back and forth all the time; that there was hardly a day but that he passed around the mine somewhere; that he worked on the Phœnix a few days, and that the parties could not have worked on the Burroughs during the first part of 1890 without him seeing them; that if anyone had worked there he must have known it. He testified that he knew the witnesses of the defendant below, William Williams and Arthur Lugg, and he knew Matthews in his lifetime, and that if these men had been working up there the first three or four months of 1890 he must have known it.

James Williams, a miner, knew the Burroughs lode about 20 years. In 1890 he worked on the Leavenworth, about a mile from the Burroughs, and passed within 600 or 700 feet of the property every day, and did not know of any work having been done thereon in 1890, and that he would have known it if it had been done. The ground he worked on was west of the Burroughs lode, about 350 feet west of the Clear Discovery shaft. Did not see anybody working in the Gould shaft; that if anybody had been working there in the spring of 1890 he would have known it because he knew where the men in the settlement worked. He knew Williams, Lugg, and Matthews. They did not work in the Gould shaft in 1890. In that year they worked in the shaft 78 feet west of the Ophir shaft, 108 feet east of the Gould monument, off of the ground in controversy. That he walked by the shaft where Williams and others were working twice a day in 1889 and 1890. This testimony is not obnoxious to the criticism that it is negative in character. As to whether the locator has done the necessary amount of assessment work to entitle him to hold his claim, when contested, the evidence of the assessment necessarily is more or less in form negative. The witnesses ordinarily can only testify that they did not see the work done. The value of their testimony is conditioned upon their opportunities for observation and their relation to the situs of the mine, so as to enable them to see it and to say whether it was probable that they would have observed such a physical fact as the working of the mine had it been done before their eyes. These witnesses were miners. From the very habits of their vocation they would take notice of the presence of their fellows engaged in such work within the range of their vision, where they were daily passing, doing like work in close proximity. It is a noteworthy fact that Clear and others who lived in the immediate vicinity of this mining claim, familiar with it many years prior to 1890, passing by it during

that year, should in 1891 express their confident assurance in its being public domain, based upon the absence of any work having been done on the ground in 1890, by entering thereon and making the location shaft.

To meet this persuasive proof, the defendant below introduced William Williams, who testified that he was living in that vicinity in 1889 and 1890 and knew the Burroughs lode and the Gould shaft, and worked in the shaft in 1889 and a part of 1890; that he was working about 100 feet down in the shaft; that he was working under a lease from Messenger, who was defendant's agent; that Matthews was interested in the lease with him and Arthur Lugg drove the whip; that he thought they did $200 or $300 worth of work in the shaft. Matthews is dead. The cross-examination of this witness demonstrated beyond any reasonable contestation that if he worked there at all it was in 1889. His statements were so confused and contradictory as to destroy the effect of his testimony as to his work there in 1890. The cross-examination further developed the fact that he had for some time been out of the country where this mine was located, and was living at Idaho Springs. He could not tell the year he left the locality of the mine. It further developed the suggestive fact that W. C. Matthews, brother of Thomas Matthews, who seems to have been acting in behalf of the defendant below, hunted up this witness at Idaho Springs, who, though he had never worked on the premises, had refreshed the witness Williams' mind as to the circumstances. In response to the question: "Will you swear you ever struck a pick in that ground in 1890?" He answered: "No, sir, I won't."

"Q. Don't you know that you didn't? A. I don't believe I did. Q. Now, you are certain, aren't you, that you began to work in the spring of 1889, and worked about two months? A. Worked two or three months. Q. You are also certain you went back there about three months later and then went to work again and worked about three months? A. Yes, sir. Q. Never worked there after that, did you? A. No, sir."

When inquired of, if as a matter of fact he had not forgotten all about the matter when William Matthews came to see him, this question was asked him:

"If he hadn't come to see you you would have never remembered anything more about it? A. Yes, sir."

Arthur Lugg, a witness for the defendant, testified that he lived at Nevadaville, which is near the Gould shaft, until he was about 15 years old; that he knew the Gould shaft, and worked there one Saturday driving the whip horse (used for hoisting) when he was 13 years old; that being 13 years before the trial. This witness was also approached by said William Matthews, who asked him if he did not work for Tom and William, and he said, "Yes."

The last witness for defendant below was Mrs. Eliza Matthews, widow of the man who is alleged to have done the work. She testified that she remembered her husband to have worked there in 1890 on account of the birth of her son; but she testified that he worked alone there that year, and that Williams worked with him the previous year, and she also put the boy Lugg there with him in 1889. It was further

developed on cross-examination that from the time of the alleged work to a few days previous to the trial she had never thought of the matter; and she said her husband never worked there after September, 1890, and when confronted with his affidavit to his having done work there in 1893, she admitted that she did not remember dates, because she never interested herself with the mining at all.' If she is to be credited the other two cannot be, since she testified to work done by her husband along in 1890, and she is the only one who does so testify. In this she is flatly contradicted by three witnesses, to say nothing of the remarkable circumstance of a man working unaided in a mine 100 feet below the ground.

Judge Riner, who presided at this trial, after the argument on the motion for an instructed verdict, said:

"I have watched this testimony with a good deal of care. My own view is that you have not shown the amount of assessment work over there to entitle you to that. As to the work you did in the Gould shaft, you bring in here a woman who testified her husband worked there a certain time, and a boy who said he worked there one Saturday driving a horse; and against this testimony we have the testimony of Mr. Williams, who testified that he passed there every day. I think the plaintiff has the preponderance of the evidence as against you, so that I am inclined to grant the instruction. I do not think the testimony showing the amount of your assessment work is at all satisfactory; it would not be to me, and I think it fails in that, so far that it brings the case within the rule that obtains in this court, viz.: When the court is satisfied that the verdict should be but one way, it is its bounden duty to instruct that way. I think the preponderance of the evidence is in favor of the plaintiff's contention that you did not do the assessment work."

No right-minded, self-asserting judge, with a proper sense of duty, will permit a judgment, subject to his supervisory control, to be entered which his intelligent conviction advises him is unsustained by sufficient evidence. While abstaining from an undue assumption of the province of the jury to determine where the truth lies in conflicting evidence, and the reasonable inferences to be drawn therefrom, as said by Mr. Justice Brewer, in Patton v. Texas & Pacific Ry. Co., 179 U. S. 660, 21 Sup. Ct. 275, 45 L. Ed. 361:

"The judge is primarily responsible for the just outcome of the trial. * * * He has the same opportunity that jurors have for seeing the witnesses, for noting all those matters in a trial not capable of record, and when in his deliberate opinion there is no excuse for a verdict save in favor of one party, and he so rules by instructions to that effect, an appellate court will pay large respect to his judgment."

In Cudahy Packing Company v. Marcan, 106 Fed. 645, 45 C. C. A. 575, 54 L. R. A. 258, the syllabus prepared by the court lays down the proposition that:

"At the close of the evidence there is always a preliminary question for the judge before the case can be properly submitted to the jury, and that is whether or not there is any substantial evidence upon which the jury can properly return a verdict in favor of the party who produces it, and, if there is no such evidence, it is the duty of the court to direct the jury to return a verdict against him."

Conceding that, under the pleadings, the burden was upon the plaintiff below to show the failure of the defendant below to perform the essential work on the claim in question for the year 1890, we are satisfied

from an examination of all the evidence that the trial court was warranted in directing a verdict for the plaintiffs. In view of this conclusion, it is unnecessary to consider other questions raised in the assignment of errors.

The judgment of the Circuit Court is affirmed.